UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

LARRY HARMON and HARMON,       )
CASTILLO, LLP f/k/a LARRY HARMON )
& ASSOCIATES, P.A.,            )
                               )
                Plaintiff,     )
                               )
        vs.                    )        10 C 1823
                               )
BEN GORDON,                    )
                               )
                Defendant.     )

## MEMORANDUM OPINION

CHARLES P. KOCORAS, District Judge:

The parties to this action have filed cross-motions for summary judgment pursuant to Federal Rule of Civil Procedure 56. Plaintiffs Larry Harmon ("Harmon") and Harmon-Castillo, LLP, (collectively, "LHA") filed a motion for summary judgment and Defendant Ben Gordon ("Gordon") filed a cross-motion for summary judgment. For the reasons set forth below, Harmon's motion is denied and Gordon's motion is granted as stated herein.

## BACKGROUND

Plaintiff Harmon is an individual residing in California and Harmon-Castillo, LLP, is a California-based entity serving as accountant and business manager for

professional athletes. Defendant Gordon is a professional basketball player currently employed by the Detroit Pistons of the National Basketball Association ("NBA").

Gordon was drafted by the Chicago Bulls in 2004 and signed a three-year rookie contract with an option for the Chicago Bulls to extend his contract to a fourth year. On May 17, 2004, Gordon entered into a consulting agreement (the "Agreement") with LHA, whereby Gordon engaged LHA as his consultant and financial adviser. The Agreement stated that LHA's financial services would be provided for the "duration of [Gordon's] playing career." However, the parties agreed to a prospective compensation arrangement only for the duration of Gordon's rookie contract. The Agreement provided that, in exchange for its services, LHA would receive flat monthly payments of $4,000 during Gordon's rookie season, $5,000 during his second season, and $6,000 during his third and possibly fourth season. The Agreement also provided that after Gordon's rookie contract, the parties would evaluate the "amount of work" performed by LHA and LHA would provide Gordon with "a new engagement letter."

In April 2006, Harmon contacted Gordon to discuss a change in the fee structure of the Agreement. On May 5, 2006, Harmon informed Gordon by e-mail that, starting April 2006, the flat monthly payments would be replaced by a new percentage-based fee amounting to 1.5% of Gordon's annual income. From April 2006 to June 2007,

monthly invoices were sent to Gordon and, pursuant to the modified fee schedule, all invoices were paid.

On February 12, 2007, Gordon agreed to transfer $1,000,000 to Vitalis Partners, an entity affiliated with LHA, and the parties executed a promissory note memorializing their agreement. Gordon alleges that Harmon described the transaction as though the money being transferred would be used to acquire an ownership interest in real estate property. LHA asserts that Gordon was never promised an ownership interest in the property and that the instrument the parties signed expressly disclosed that the transaction was a loan obligating LHA to repay the funds within a certain period of time. Ultimately, we ruled in Gordon's favor based on Vitalis Partners' failure to timely repay the borrowed money. *See Gordon v. Vitalis Partners, LLC*, No. 07 C 6807, 2010 WL 381119, at *2 (N.D. Ill. Jan. 27, 2010). We also held that the transaction constituted a loan with no ownership interest conferred to Gordon. *Id*.

On July 1, 2007, Gordon terminated LHA's services. His rookie contract continued into 2008.

On March 2, 2010, LHA filed suit against Gordon asserting a breach of contract claim. The parties dispute the exact duration of the Agreement. According to LHA, at no time did the parties intend or agree to limit the duration of their engagement. LHA claims that the parties agreed that LHA would provide its services throughout Gordon's

entire NBA career. On the other hand, Gordon alleges that the parties intended the Agreement to be in force only for a maximum of four years since the Agreement anticipated that at the end of his rookie contract the parties would evaluate LHA's performance and sign a new engagement letter. Each party now moves for summary judgment.

## LEGAL STANDARD

Summary judgment is appropriate only when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. Fed. R. Civ. P. 56(c). A genuine issue of material fact exists when the evidence is such that a reasonable jury could find for the nonmovant. *Buscaglia v. United States*, 25 F.3d 530, 534 (7th Cir. 1994). The movant bears the burden of demonstrating the absence of a genuine issue of material fact by specific citation to the record; if the party succeeds in doing so, the burden shifts to the nonmovant to set forth specific facts showing that there is a genuine issue of fact for trial. Fed. R. Civ. P. 56(e); *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). In considering motions for summary judgment, a court construes all facts and draws all inferences from the record in favor of the nonmoving party. *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 255 (1986).

When parties file cross-motions for summary judgment, each motion must be assessed independently, and denial of one does not necessitate the grant of the other. *M. Snower & Co. v. United States*, 140 F.2d 367, 369 (7th Cir. 1944). Rather, each motion evidences only that the movant believes it is entitled to judgment as a matter of law on the issues within its motion and that trial is the appropriate course of action if the court disagrees with that assessment. *Miller v. LeSea Broad., Inc.*, 87 F.3d 224, 230 (7th Cir. 1996). With these principles in mind, we turn to the parties' motions.

## DISCUSSION

LHA argues that it is entitled to summary judgment on its breach of contract claim. To establish a breach of contract claim under Illinois law, LHA must prove (1) the existence of a valid and enforceable contract, (2) performance by LHA, (3) breach by Gordon, and (4) resulting injuries to LHA. *Gallagher Corp. v. Russ*, 721 N.E.2d 605, 611 (Ill. App. Ct. 1999).[1] Gordon argues that the parties had not agreed on a valid contract for the duration of Gordon's playing career and that he was entitled to terminate the Agreement because of LHA's wrongdoings. We will address each argument in turn.

---

[1] The parties do not dispute that Illinois law governs their relationship.

## I.    The Duration of the Agreement

LHA argues that the language contained in the Agreement is subject to only one reasonable interpretation: the Agreement was to be in effect for the duration of Gordon's NBA career. Gordon argues that the language is equivocal but still subject to one reasonable interpretation: the parties intended the Agreement to expire with Gordon's rookie contract and that a new contract had to be agreed upon. The facts established during discovery indisputably establish that Gordon's interpretation is the correct one.

To establish the formation of a valid and enforceable contract, a plaintiff must establish that the essential terms of the contract were definite and certain. *Midland Hotel Corp. v. Reuben H. Donnelley Corp*., 515 N.E.2d 61, 65 (Ill. 1987). A contract is sufficiently definite and certain if the court is able "under proper rules of construction . . . to ascertain what the parties have agreed to do." *Id*. In construing a contract, a court must give effect to the parties' intent. *Gallagher v. Lenart*, 874 N.E.2d 43, 58 (Ill. 2007). A court looks to the language of the contract alone, "as the language, given its plain and ordinary meaning, is the best indication of the parties' intent." *Id*. If a contract is ambiguous, the parties may submit extrinsic evidence to decipher the meaning of the ambiguity and ascertain the parties' intent. *Regency Commercial Assocs, LLC v. Lopax, Inc.*, 869 N.E.2d 310, 316 (Ill. App. Ct. 2007). Ambiguity may be found where the

language of the contract is "reasonably susceptible to more than one meaning." *Cent. Ill. Light Co. v. Home Ins. Co.*, 821 N.E.2d 206, 213 (Ill. 2004). Generally, contractual ambiguity is a question of fact and therefore not susceptible to decision at the summary judgment stage. *Cont'l Cas. Co. v. Nw. Nat. Ins. Co.*, 427 F.3d 1038, 1041 (7th Cir. 2005). However, "if a contract is ambiguous, its interpretation is a question of law for the court as long as the extrinsic evidence bearing on the interpretation is undisputed." *Id*. In such cases, summary judgment is appropriate.

Harmon was deposed in this case on November 6, 2008. A transcript of his testimony, in its relevant aspects, reflects the following:

> Q.   Is this a form letter you used for all of your NBA clients at the time?
>
> A.   Yes. At the time, yes.
>
> Q.   There's a three-part fee structure discussed in this engagement letter. Is this the fee structure that was originally agreed upon by Mr. Gordon and you?
>
> A.   Yes.
>
> Q.   So this would have been 4,000 per month plus out-of-pocket expenses in Year 1, then 5,000 per month plus out-of-pocket expenses in Year 2, and then 6,000 per month plus out-of-pocket expenses in Year 3 and 4?
>
> A.   Yes.
>
> Q.   How were you going to determine at that point in time as of May 2004, how were you going to determine what Mr. Gordon would pay you after the fourth year?
>
> A.   After sitting down and talking about it.
>
> Q.   Would there be a new contract executed at that time?
>
> A.   That's correct.
>
> Q.   Okay. So it was contemplated at the time of this contract that in four years - in three or four years, depending on whether

his option was exercised, whether you and Mr. Gordon would execute another contract?

A.  Correct.

[. . .]

Q.  Do you have any idea what that new contract would have said?

A.  What that new contract would have said?

Q.  Yeah.

A.  At that particular time?

Q.  Yeah.

A.  No.

Q.  Do you have any idea what the fee agreement would have been at that particular time?

A.  It says right here "amount of work we performed on your account" - "provide you with a new letter."

Q.  That would be a negotiation between you and Mr. Gordon at that time, right?

A.  Correct.

Q.  It was contemplated at the time of May of 2004 that this contract would be in force or effect for three or four years, and then you'd execute another contract with Mr. Gordon?

A.  That's correct.

Q.  As you sit here today, there's no way you could have predicted what that contract would have said?

A.  Correct.

Q.  In fact, there is no way you could have predicted if Mr. Gordon would have even signed another contract; is that correct?

A.  Never prediction of that.

Q.  Okay. So it would be all speculation to say that Mr. Gordon, after three or four years, would have signed another contract with you?

A.  You would think that most of the work you do, most of your clients are lifetime contracts, but you don't know.

Q.  Did Mr. Gordon ever sign another written contract with you after this?

A.  Not a signed, but - the answer is no.

Harmon's deposition testimony indicates that at the end of Gordon's rookie contract, the parties intended to evaluate LHA's work performance and potentially enter into a new contract. However, there was no evaluation of work performed, no provision of a new engagement letter, no meeting of the minds as to the work to be performed, no agreement as to the fees to be charged for any work to be performed, or the length of time any new agreement would have legal force and effect. All of these issues constitute material terms necessary to the creation of a contract and required a meeting of the parties' minds for any future reliance thereon. Harmon's testimony reflects an understanding, consistent with Gordon's, that there was to be a second or succeeding negotiation at which a meeting of the minds would occur and provide the terms material to an executed and enforceable contract. That did not happen here.

Indeed, the friction that developed between Gordon and Harmon during the course of the original agreement militated against a set of terms compatible with the parties' desires and objectives. Although this court has previously found that Gordon was bound to the changed fee structure unilaterally proposed by Harmon by virtue of his conduct, Gordon's actions in paying fees under the revised structure was neither bargained for nor affirmatively accepted.

Additionally, Gordon expressed displeasure and disagreement with Harmon's treatment of Gordon's $1,000,000 advance to Harmon and the failure to repay the

money. Harmon's words reflect that a discussion of fees was called for so that a mutual agreement could be reached. No such discussions or mutual agreement as to the fee question were ever achieved. Indeed, as described previously, virtually all of the material terms of this type of relationship were never agreed upon, and the contract of May17, 2004, had run its course. As a matter of fact and law, the 2004 contract cannot be relied upon to accept Harmon's contentions that the percentage fee he was collecting under the 2004 contract would apply for the duration of Gordon's professional career. Attempts by Harmon to recant his sworn deposition testimony by a supplemental affidavit are ineffectual. A party cannot submit an affidavit whose statements contradict prior deposition or sworn testimony. *Buckner v. Sam's Club, Inc.*, 75 F.3d 290, 292 (7th Cir. 1996).

Accordingly, there is no material issue of fact that the parties entered into only one contract which was intended to be in force for three, and were the Chicago Bulls to exercise their option, four years. It is also undisputed that once the fourth year finished, the rookie contract between Harmon and Gordon terminated. Since no new contract between the parties was entered into, Gordon's legal obligations to continue paying Harmon ended in June 2008.

## II.     Damages

Gordon argues that he was entitled to terminate the Agreement in July 2007 because he lost trust in Harmon when Harmon unilaterally changed the fee structure; when Harmon failed to repay the money Gordon had advanced; and when Harmon represented that Gordon was loaning money to acquire an ownership interest in real estate. Gordon, however, is precluded from relitigating issues that have been decided in our previous ruling. While these events suggest that Gordon was not of a mind to reengage Harmon to deal with his professional financial affairs in the future, this court's prior rulings preclude a revisitation of those issues.

Harmon's damages claim of $1,254,782.08 is based on the premise that Gordon was contractually obligated to employ LHA to act as his advisors and consultants for the duration of his playing career and to pay them accordingly, in accordance with the May 17, 2004 contract. Both of Harmon's assertions are belied by his own deposition testimony that a new contract would have to be executed by the parties after negotiations were had. There was never a new contract discussion, no material terms such as services to be rendered, fees to be paid, or term of contract agreed upon or resolved. When the May 17, 2004 contract was signed, it was the contemplation of all the parties that these things would take place. Accordingly, the parties' mutual rights

and obligations terminated upon completion of Gordon's fourth season as a professional basketball player.

## CONCLUSION

For the reasons expressed above, Gordon's motion for summary judgment is granted and LHA's motion for summary judgment is denied.

_____
Charles P. Kocoras
United States District Judge

Dated:   August 25, 2011